NORTH CAROLINA STATE CONFERENCE OF THE NAACP; Emmanuel Baptist Church; Covenant Presbyterian Church; Barbee's Chapel Missionary Baptist Church, Inc.; Rosanell Eaton; Armenta Eaton; Carolyn Coleman; Jocelyn Ferguson-Kelly; Faith Jackson; Mary Perry; and Maria Teresa Unger Palmer, Plaintiffs,

v.

Patrick Lloyd MCCRORY, in his official capacity as Governor of North Carolina; Kim Westbrook Strach, in her official capacity as Executive Director of the North Carolina State Board of Elections; Rhonda K. Amoroso, in her official capacity as Secretary of the North Carolina State Board of Elections; Joshua D. Malcolm, in his official capacity as a member of the North Carolina State Board of Elections; James Baker, in his official capacity as a member of the North Carolina State Board of Elections; and Maja Kricker, in her official capacity as a member of the North Carolina State Board of Elections, Defendants.

League of Women Voters of North Carolina; A. Philip Randolph Institute; Unifour Onestop Collaborative; Common Cause North Carolina; Goldie Wells; Kay Brandon; Octavia Rainey; Sara Stohler; and Hugh Stohler, Plaintiffs,

and

Louis M. Duke; Asgod Barrantes; Josue E. Berduo; Charles M. Gray; Nancy J. Lund; Brian M. Miller; Becky Hurley Mock; Mary-Wren Ritchie; Lynne M. Walter; and Ebony N. West, Plaintiff-Intervenors,

v.

The State of North Carolina; Joshua B. Howard, in his official capacity as a member of the State Board of Elections; Rhonda K. Amoroso, in her official capacity as a member of the State Board of Elections; Joshua D. Malcolm, in his official capacity as a member of the State Board of Elections; Paul J. Foley, in his official capacity as a member of the State Board of Elections; Maja Kricker, in her official capacity as a member of the State Board of Elections; and Patrick L. McCrory, in his official capacity as the Governor of the State of North Carolina, Defendants.

United States of America, Plaintiff,

v.

The State of North Carolina; The North Carolina State Board of Elections; and Kim W. Strach, in her official capacity as Executive Director of the North Carolina State Board of Elections, Defendants.

1:13CV658
1:13CV660
1:13CV861

United States District Court,
M.D. North Carolina.

Signed October 13, 2016

Bridget K. O'Connor, Christopher J. Maner, Daniel T. Donovan, Kirkland & Ellis, LLP, Jodi K. Wu, Kenneth Winn Allen, Michael A. Glick, Ronald K. Anguas, Jr., Susan Marie Davies, Thomas D. Yannucci, Kirkland & Ellis, LLP, Caitlin Swain-McSurely, Denise D. Lieberman, Donita Judge, Jadine C. Johnson, Jasmyn G. Richardson, Advancement Project, Penda Denise Hair, Washington, DC, Jennifer R. Basch, John J. Song, Madelyn A. Morris, Kirkland & Ellis, LLP, New York, NY, Irving Joyner, N.C. Central University School of Law, Cary, NC, Adam Stein, Tin Fulton Walker & Owen, PLLC, Chapel Hill, NC, for Plaintiffs.

Karl S. Bowers, Jr., Bowers Law Office LLC, Columbia, SC, Alexander McClure Peters, N.C. Department of Justice, Phillip John Strach, Thomas A. Farr, Michael Douglas McKnight, Ogletree Deakins Nash Smoak & Stewart, P.C., Raleigh, NC, Amy M. Pocklington, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Richmond, VA, Elizabeth R. Dangel, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Charlotte, NC, for Defendants.

## ORDER

Thomas D. Schroeder, United States District Judge

Before the court is the "Emergency Motion to Enforce The Injunction" filed by the "Duke Intervenor" Plaintiffs in these consolidated cases. (Doc. 439.)[1] Duke Intervenors also seek an order to show cause why Defendants should not be held in contempt of court. (Doc. 440 at 20.) No other Plaintiff has joined in the motion or seeks this relief. Defendants filed an expedited response, at the court's direction. (Doc. 444.) No party sought oral argument, but the court held an expedited telephonic hearing at 5:00 p.m. on October 11, 2016. The motion is now ready for consideration.

## I. BACKGROUND

Duke Intervenors' motion is asserted to rely on this court's July 29, 2016 judgment and injunction effectuating the Fourth Circuit's decision invalidating certain provisions of North Carolina Session Laws 2013-381 and 2015-103. (Doc. 434.) Pertinent here, the injunction reinstated the State's pre-2013 early (one-stop, absentee) elections law, which requires each County Board of Elections ("CBOE") to make available early voting starting the third Thursday before Election Day, continuing to 1:00 p.m. the Saturday before Election Day. See N.C. Gen. Stat. § 163–227.2(b) (2002). This effectively extends early voting from 10 to 17 days.

Following the court's order, the State's 100 CBOEs held immediate hearings to reconfigure their early voting plans, many of which had already been developed under the prior law and approved by the State Board of Elections ("SBOE").[2] (Doc. 444-1 at 4.) On August 4, the SBOE directed all CBOEs to redraw their plans to comply with the reinstated State law by August 19. (Id. at 14.) The SBOE instructed that five options were available under law: (1) extend the previously submitted plan to the entire 17-day early voting period; (2) retain the previous plan but add an early voting site at the CBOE, as provided by statute; (3) adopt a new plan for the CBOE site and additional sites; (4) adopt a new plan at the CBOE site only; and (5) in case no CBOE action is taken, the default plan will be that all early voting will occur at the CBOE site only during regular business hours and on the last Saturday until 1:00 p.m., as per statute. (Id. at 15.) SBOE reminded all CBOEs that 56% of all voters were expected to vote early and that State law required at a minimum the default plan noted above. (Id. at 14-15.)

Sixty-seven CBOEs adopted unanimous early voting plans that were not appealed to the SBOE. (Id. at 4-6.) Thirty-three CBOE plans adopted by divided (2 to 1) votes were appealed. (Id.)

On September 6, counsel for Duke Intervenors and Plaintiffs in these consolidated cases co-signed a letter to the SBOE to set forth various concerns about 24 counties' CBOE plans. (Doc. 442-8.) The letter noted that the lawyers were moni-

---

1. All citations are to the filings in case number 1:13cv861, unless otherwise noted.

2. The five-member SBOE is bipartisan but controlled by the political party of the governor—here, the Republican Party, which holds three seats.

toring the SBOE for compliance with State law and this court's injunction. (Id.) The parties also threatened to seek "immediate emergency judicial relief" if the alleged "obvious intentional discrimination" represented by the plans was not rectified. (Id.)

On September 8, the SBOE held twelve hours of hearings on contested plans, during which partisans representing all factions appeared, and announced decisions as to each challenged county plan. (Doc. 444-1 at 5-6.) In 19 of 33 challenged plans, the SBOE adopted either the majority or minority plan. (Id.) In the remaining 14 counties, the SBOE created its own plans. (Id. at 6.) The SBOE memorialized the plans September 13, 2016. (Id.)

On September 21, counsel representing Duke Intervenors and the NAACP Plaintiffs wrote the SBOE requesting changes to three early voting plans (including those of Forsyth and Guilford Counties). (Doc. 442-10 at 2-4.) All of these voting plans were unanimously adopted by the CBOEs and approved by SBOE. (Doc. 444-1 at 6.) SBOE responded on September 23 that those plans had been administratively approved, as per "long-standing" SBOE practice, and, moreover, it was too late to make changes because State law requires counties to publish election notices, including information about one-stop early voting plans, by September 24. (Doc. 442-11); see N.C. Gen. Stat. § 163–128(a).

Duke Intervenors filed their present motion October 1 (a Saturday) challenging 5 of the 100 plans approved by the SBOE. (Doc. 439.) The court entered an order the next business day for expedited response. (Doc. 443.) Defendants filed their response on October 7 (Doc. 444), and the court held a telephonic hearing the next business day (after Columbus Day).

## II. ANALYSIS

### A. Timing

Defendants raise as a threshold matter the significant question of timing. (Id. at 11.) Early voting commences in one week, on October 20, 2016. (Doc. 442-2 at 2.) Duke Intervenors' motion comes more than five weeks after the unanimous Guilford and Forsyth CBOE plans were submitted to the SBOE on August 24, and twenty-three days after the SBOE's September 8 hearing during which it announced its ruling on the other 3 plans challenged here. (See Doc. 444-1 at 4, 30.)[3] As noted by the SBOE's executive director, State law required the publication of early voting locations (as well as other precinct information) no later than forty-five days before the election—in this case, September 24, 2016. See N.C. Gen. Stat. § 163-128(a) ("Upon adoption of a resolution establishing, altering, discontinuing, or creating a precinct or voting place, the board shall give 45 days' notice thereof prior to the next primary or election."). Thus, all CBOEs and the SBOE were under a very tight time frame to implement the Fourth Circuit's decision.

Defendants have provided evidence that attempting to alter the location of early voting sites would be difficult and cause disruption at this late date. (See Doc. 444-1 at 12-13 (Declaration of SBOE Executive Director Kim Westbrook Strach noting need to republish notices, unplanned efforts to staff early voting sites, and coordination with third-party property owners).) Added to this are concerns about establishing secure electronic voting equipment at each site. (Doc. 444-2, ¶ 3(g) (describing "difficult and time-consuming process" required to set up secure computer and in-

---

**3.** The SBOE provided notice of its rulings in a September 13 letter (Doc. 444-1 at 30-36), but Duke Intervenors were already aware of the results because their representatives appeared at the September 8 hearing.

formation technology networks).) Counsel for the State reiterated these same concerns during the October 11 hearing, explaining that at this stage the changes are "probably logistically impossible."

In Purcell v. Gonzalez, the Supreme Court acknowledged that changes to election law and procedures close to an election risk voter confusion. 549 U.S. 1, 4–5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."). The Fourth Circuit recognized this concern when denying Defendants' motion to recall the mandate in this case. (Doc. 435 at 7.) Courts must be careful to weigh the effect that last minute changes would have on implementation of election procedures. See, e.g., Veasey v. Perry, 769 F.3d 890 (5th Cir. 2014) (staying on Purcell grounds a district court's injunction issued twenty-four days before the 2014 election). On the other hand, late-blooming problems are not necessarily immune to correction because of Purcell. See, e.g., Obama for Am. v. Husted, 697 F.3d 423 (6th Cir. 2012) (affirming grant of a late-stage injunction of an early voting policy); Winter v. Wolnitzek, 56 F.Supp.3d 884 (E.D. Ky. 2014) (enjoining enforcement of a campaign-speech law six days before an election).

In this case, the court finds that the changes the Duke Intervenors seek to the early voting plans would create logistical difficulties, especially given potential voter confusion and the need to coordinate properly trained staff, computer system setup, and site management. These challenges are amplified by the fact that voters have already received statutory notice of the available locations and times for voting.

## B. Procedural Problems

Apart from the timing problem, the Duke Intervenors fail to demonstrate that Defendants have violated this court's injunction, which is the basis for their returning to this court for relief. Applicable here, the court's final judgment struck SL 2013-381's provisions relating to early voting, returning the State to the statutory law previously in effect. (Doc. 434.) There is no question the State complied with the express terms of the injunction; Duke Intervenors do not demonstrate otherwise. There is also no question that the challenged plans comply with the letter of prior law; Duke Intervenors do not point to any statutory provision of North Carolina election law that has been violated. The Federal Rules of Civil Procedure require injunctions to be specific for a reason: so the prohibited conduct can be proscribed. See Fed. R. Civ. P. 65(d)(1) (requiring every injunction to state its terms "specifically" and the acts to be restrained "in reasonable detail"). In short, there is no demonstration that Defendants either reinstated prior law or failed to enforce current law, the specific subject of the court's injunction.

What Duke Intervenors argue, rather, is that Defendants and CBOEs have engaged in other discriminatory conduct in implementing their responsibilities. To avoid filing new actions against this new conduct, however, they characterize it as a "blatant attempt[ ] to make an end run around [N.C. State Conference of the NAACP v. McCrory, 831 F.3d 204 (4th Cir. 2016)] and this Court's injunction." (Doc. 440 at 7.) Duke Intervenors offer two forms of proof.

First, they prominently cite an August 17, 2016 email from the executive director of the North Carolina Republican Party who recounts that "many registered Republicans" have "expressed concern that our fair and honest election process is .

being undermined by the Fourth Circuit's NC Voter ID ruling." (Doc. 442-4.) Noting that CBOEs would be meeting to discuss revised plans, he encouraged party officials to "call your republican election board members and remind them that as partisan republican appointees they have [a] duty to consider republican points of view." (Id. at 2.) The email reiterated the minimum statutory requirements of the early voting law, including the default rules under the statute, and included comments such as, "Many of our folks are angry and are opposed to Sunday voting." (Id. at 4.) The email "encourage[d]" recipients to "show your [CBOE] members support during this time." (Id.) Duke Intervenors argue that the email is evidence of an intent to end-run the court's injunction. (Doc. 440 at 5.)

Of course, CBOEs and the SBOE have the obligation to ensure the best plan for each county, considering all legally relevant factors, consistent with the Fourth Circuit's decision, which is to say consistent with federal law and the Constitution. North Carolina election law directs the SBOE to accept unanimously-approved CBOE plans, but it expressly requires the SBOE to take into account "geographic, demographic, and partisan interests of [each] county" when resolving petitions over competing plans. N.C. Gen. Stat. § 163–227.2(g). By inference, these are considerations for a CBOE, too. But the statutory directive permits only proper consideration of such factors; for example, early voting sites must be fairly sited in the county as a whole (as far as possible), not favoring partisan interests. Id. It does not give license to violate the Voting Rights Act or the Constitution in an effort to avoid the consequences of the court's injunction. Insofar as 95 of the 100 county plans are not challenged, each plan turns on the unique facts of each county, and the time frame for altering early voting plans to comply with the court's injunction was

highly compressed, the court is hard pressed to conclude on the record before it that the partisan statements by a party operative (or speculative actions of other possible, unnamed surrogates) provide a sufficient nexus to demonstrate wrongdoing by any CBOE or the SBOE. Regal Knitwear Co. v. NLRB, 324 U.S. 9, 13, 65 S.Ct. 478, 89 L.Ed. 661 (1945) (holding that to be subject to an injunction, a non-party must act in concert with or aid and abet the enjoined party).

Second, Duke Intervenors point to certain aspects of the challenged plans they contend violate the Fourth Circuit's reasoning, or in some cases to preliminary versions of plans that were not even adopted. (Doc. 440 at 2-20.) In doing so, they compare the approved plans to prior plans they contend are more generous to minority voters. (Id. at 2, 6–20.) In this effort, they are not always consistent, sometimes picking and choosing the year, election cycle, and aspect of the early voting plan that most favor their argument, even though the record makes clear that plans were the product of competing considerations and compromise.

█ It is true that an enjoined party can be subject to sanction for a "violation of the spirit of the injunction, even though its strict letter may not have been disregarded." Folk v. Standard Bus. Forms, Inc., 270 F.Supp. 147, 156 (W.D.N.C. 1967) (citing Cal. Fruit Growers Exch. v. Sunkist Drinks, 25 F.Supp. 401 (S.D.N.Y. 1938); Prang Co. v. Am. Crayon Co., 58 F.2d 715 (3d Cir. 1932); John B. Stetson Co. v. Stephen L. Stetson Co., 128 F.2d 981 (2d Cir. 1942)). But an enforcement proceeding such as this is in effect a continuation of the original lawsuit. Id. at 155. So, care must be given to demarcate the line of liability. The Fourth Circuit did not direct the implementation of any particular form of relief for early voting plans, nor is there

any indication that the court's decision contemplated ongoing monitoring or oversight. Here, while it may seem expedient to Duke Intervenors to raise their claims to CBOE plans in the guise of a violation of this court's injunction, the proper vehicle ordinarily for such challenges is a separate action—which could have been brought earlier[4]—that ensures the creation of a proper record—something that is missing here. To determine otherwise potentially subjects this court to continuing oversight of a host of discretionary decisions of North Carolina's 100 CBOEs and the SBOE relating to the State's myriad election laws.

These fundamental timing and procedural problems outlined above are only underscored by the specific challenges Duke Intervenors raise as to each CBOE plan.

### a. Nash County

■ The Nash County CBOE unanimously adopted its 2016 early voting plan before the court's injunction. (Doc. 444-1 at 9.) Under that plan, hours increased over the ten-day period of voting, totaling more than the hours offered in 2012. (Doc. 444 at 7.) This plan also provided an additional site. (Id.) Duke Intervenors do not challenge any aspect of that plan, which remains part of the current plan.

After the injunction, the CBOE approved a new plan by a 2 to 1 vote. To comply with the court's ruling, the CBOE elected to tack onto the previously-approved plan seven days of early voting at a site next door to the CBOE office in Nashville, the county seat. (Id.) It chose this site because the statute provided for it and it historically is the highest early voting site by volume in the county (providing 19,316 votes in 2012, nearly a third of the county's registered voters). (Doc. 442-7 at

54); Hearing on Petitions Regarding One-Stop Early Voting Before the N.C. Bd. of Elections 278–80 (Sept. 8, 2016) [hereinafter Early Voting Transcript], goo. gl/WtdLCT. The site will be open 9:00 a.m. to 6:00 p.m. (Doc. 442-7 at 54.) The SBOE approved the plan, at the recommendation of the majority of the CBOE, on a 4 to 1 bipartisan vote. (Doc. 444 at 7.) The plan complies with North Carolina election law, which requires that early voting be available at the CBOE office (or a site "reasonably proximate" to it) during the 17-day period. N.C. Gen. Stat. § 163–227.2(b) (2002).

Duke Intervenors argue that the SBOE violated the injunction and is in contempt of court because the Nash County plan did not include a second site at the Braswell Memorial Library in Rocky Mount during the first week of early voting. Rocky Mount is predominantly African American and has 56% of the county's African American voter population. (Doc. 440 at 7-10.) Duke Intervenors point out that the 2012 17-day plan had three early voting sites, one of which was in Rocky Mount. (Id.)

The Nash plan approved by the SBOE does include an early voting site at the Braswell library during the latter ten days of early voting when all four sites in the county are open. Early Voting Transcript at 275–92. The library is a "fairly small place and lacks the capacity to handle large amounts of voters at once." (Doc. 441-2 at 3.) By comparison to the CBOE's site to serve the whole county, it is less desirable and served only 8,628 voters in 2012. Early Voting Transcript at 278. The only site urged by the CBOE minority member, Kelly Shore, was the addition of the Braswell library; she did not seek to add the other two early voting locations.

---

**4.** Whether an earlier action would have passed muster under Purcell and related considerations remains unclear.

Id. at 280–88. Duke Intervenors cite discussion during the SBOE hearing about how the minority's plan would provide a partisan advantage to Democrats, as the Braswell library site voted approximately 90% Democrat and 10% Republican. Id. (See Doc. 440 at 8-10.) Ms. Shore acknowledged that her request to add only the library site (and not others) would indeed create a partisan advantage to the minority party, but she argued it was also a "demographic issue." (Doc. 442-7 at 63-64.) Notably, it was the Democratic member of the SBOE, Joshua D. Malcolm, and not any Republican, who expressed the concern that the minority plan "appears partisan" and would favor Democrats. (Id. at 63.)

It is not clear why Ms. Shore did not include the other two early voting sites during the first seven days of early voting, which more likely would have provided equal voting opportunity across the county. While providing the minimum statutory requirement for the first seven days may not be sufficient explanation for limiting early voting opportunities, the Fourth Circuit seemed to recognize that in the press of time to implement its ruling, CBOEs would at least be able to provide early voting at their offices. (Doc. 435 (Order denying recall of mandate) ("As to early voting locations and staffing, we were told that at a minimum the State could conduct early voting at the Board of Elections office for each county.").)

Here, the Nash County early voting plan appears to be an attempt to reach a compromise that provided equal opportunity—without partisan advantage—to all voters. The overall plan provides 14% more early voting hours (and one more site) over the 2012 plan. (Doc. 441-1.) The statutorily required consideration of partisanship to ensure fair placement of early voting sites for the first seven days does not seem to have motivated improper race-based deci-

sion-making. In any event, proof of discriminatory intent is weak. Most probative here, there is no indication that any Defendant or the Nash CBOE violated the terms of this court's injunction in providing the statutorily required voting at the CBOE office during the first seven days of early voting.

**b. New Hanover County**

 Duke Intervenors argue that the New Hanover County early voting plan eliminated Sunday voting. (Doc. 440 at 10-14.) However, they make this argument in comparison to the 2016 primary early voting plan, which provided for only ten days of early voting that included one Sunday. (Id. at 10, 12.) In fact, the 2016 general election plan adopted by the New Hanover County CBOE and challenged here was identical to the one implemented in the 2012 presidential election, which provided no Sunday voting. (Doc. 442-12 at 15.) The SBOE adopted the CBOE plan but modified it on a bipartisan 4 to 1 vote based on the petition of the Democratic member of the CBOE to add 20 evening hours of early voting over the 2012 plan. Early Voting Transcript at 253-55. The 2016 general election plan thus mirrors the 2012 presidential general election plan. The court discerns no violation of this court's injunction.

**c. Mecklenburg County**

 Mecklenburg County had competing early voting plans. Id. at 320. The majority plan provided for 22 sites during the ten-day period but six during the first week. Id. at 320–322, 330–33. One minority plan was similar but had 10 early voting sites the first week and extended the last Saturday of voting to 5:00 p.m. (from 1:00 p.m.). Id. The other minority plan was similar but opened all 22 early voting sites for the full seventeen-day period. Id. All

three plans were submitted to the SBOE for consideration. Id.

The SBOE adopted the intermediate minority plan, thus providing 22 sites overall with 10 during the first week of early voting, but modified it to adopt a closing time of 1:00 p.m. on the last day—Saturday—of early voting. Id. at 363–70. Duke Intervenors challenge the Saturday closing time,[5] arguing that it is important to African Americans, who previously disproportionately used the last four hours. (Doc. 440 at 13-15.) The Mecklenburg County SBOE director explained that a 5:00 p.m. Saturday closing did not provide him and his staff adequate time to prepare updated poll books to be distributed to precinct workers in time for Election Day (the next Tuesday). Early Voting Transcript at 366-67. Current law grants CBOEs the discretion to close at 1:00 p.m. on Saturday (SL 2013-381 had eliminated this discretion and required a 1:00 p.m. closing). See N.C. Gen. Stat. § 163–227.2(b) (2002). Nothing in the CBOE's decision-making evidences an improper motive or lack of candor in the director's explanation. Mecklenburg is the State's most populous county, and the logistical challenges for meeting the demands of timely election day coverage appear equally large.

### d. Forsyth County

■ The Forsyth County plan reflects a compromise of competing interests. Consequently, the final product was approved unanimously by the bipartisan CBOE. (Doc. 444-1 at 12.) Thus, to the extent Duke Intervenors challenge it, their challenge should be to the CBOE, which is not a party to these proceedings. As Duke Intervenors acknowledge (Doc. 440 at 16 n.7), pursuant to N.C. Gen. Stat. § 163–227.2(g), the SBOE "must ... approve[ ]" the early voting sites a unanimously-approved CBOE plan.[6] Duke Intervenors argue, however, that the SBOE was compelled to withhold approval because, they contend, the CBOE plan violates the court's injunction. (Id.)

The Forsyth plan complies with North Carolina's early voting statute, and Duke Intervenors do not contend otherwise.

Duke Intervenors note that the Forsyth plan eliminates four hours of Sunday early voting, provides the first week of early voting at the CBOE office, and eliminates a site at the campus of Winston-Salem State University, a predominantly African American university. (Doc. 440 at 17-18.) What Duke Intervenors downplay, however, is that as a compromise, the plan provided not one, but two additional countywide sites in African American neighborhoods. One is the Sprague Center, which is about 2.4 miles from Winston-Salem State University; the other is St. Paul's Methodist Church, which is about 2.3 miles from the university campus; both are in predominantly African American areas of town. (Id. at 18, n.8.) While the Winston-Salem State University site may have been more convenient for those students—a particular constituency of the Duke Intervenors, who represent "young voters" (self-defined as 18-24 year-olds)—there is no showing that the overall plan is not fair to all county voters, including minority voters. The 2016 plan has an 18% increase in early voting

---

5. Duke Intervenors argue that the SBOE's decision to permit the discretionary 1:00 p.m. closing on Saturday, when coupled with the Mecklenburg CBOE's "obviously discriminatory [majority] plan," evidences discriminatory intent. (Doc. 440 at 14.) Of course, the SBOE rejected the Mecklenburg CBOE majority plan in favor of one of the minority

plans. This can hardly be evidence of wrongful intent by the SBOE.

6. The only statutory exception is where the proposed site fails to comply with statutory requirements not relevant here. See N.C. Gen. Stat. § 163–227.2(g1).

hours, 55% increase in evening hours, and 9% increase in Saturday hours. (Doc. 444 at 10.) Moreover, the SBOE site where the first week of early voting will take place is located in downtown Winston-Salem, which is 1.3 miles from the campus of Winston-Salem State University and accessible by foot and several other modes of transportation. (Id.) These considerations led the minority member to vote for the plan. Duke Intervenors fail to show that the addition of sites and hours does not at least offset the absence of the provisions challenged, or that the decision was based on improper consideration of race.

### e. Guilford County

█ The Guilford County plan was also adopted unanimously by the CBOE. (Doc. 440 at 19.) Consequently, Duke Intervenors' challenges to it bear the same burdens as they do with the Forsyth County plan noted above.

Duke Intervenors focus on initial plans that were not adopted by the CBOE. In the end, however, the CBOE adopted a 2016 early voting plan that reflected a compromise and was approved unanimously. (Id. at 19–20.) Under the compromise plan, the first seven days of early voting will take place at the CBOE (downtown at the Old Courthouse on West Market Street), and thereafter early voting will be provided at 25 sites (3 more than in 2012) and includes Sunday voting. (Doc. 444-1 at 12.) Duke Intervenors challenge the provision of voting at the CBOE for the first week of early voting as too little, noting that 2012 had 16 sites that saw some 60,-732 voters. (Doc. 440 at 19-20.)

It is difficult on this record to understand the reasoning of the Guilford CBOE in adopting its plan, given that the Old Courthouse is said to accommodate about 2,000 voters per day—much fewer than the overall first week traffic in 2012. (Id.; Doc. 442-10 at 2-3.) This is further indication

that challengers to the plans should have brought proper lawsuits against the CBOE, where the claims could be litigated and the record developed. There, such claims may have found some success.

However, the plan was approved by the minority member and has slightly more total hours than the 2012 plan, including expanded days (11.5 hours per day (Doc. 444-2 at 4)) and more total Saturday and Sunday hours (Doc. 444 at 20). Had the minority member dissented, the record suggests strongly that the SBOE would have entertained consideration of additional early voting sites during the first week, because it did just that when the Wake County CBOE plan was appealed. See Early Voting Transcript at 259-75. It is hard to say that the SBOE violated this court's injunction for approving a unanimous, compromise plan adopted by the CBOE. Something in the Guilford County plan satisfied the minority member, even during what has been described as a contentious and raucous CBOE hearing. (Doc. 440 at 19.)

The Guilford County CBOE director testifies that at this time he is "very concerned with the ability to place adequate staff at any additional sites to necessary levels, with necessary demographics, and job expertise with only 1.5 weeks to prepare." (Doc. 444-2 at 4.) He also testifies that including an additional week "may be impossible" with such short notice. (Id. at 5.) The CBOE also utilizes an electronic poll book check-in process through a secure Wi-Fi network, which has to be set up at each location. (Id.) The director concludes that the current schedule is "very constricted" and to include an additional week "will prove to be difficult." (Id.) Counsel for Defendants noted at this court's hearing that these concerns are more pronounced now, as time has passed.

In summary, even assuming that Duke Intervenors' claims raise serious questions, the lateness of their challenge vis-à-vis the start of early voting, as well as the attenuated relationship their claims have to the terms of this court's injunction, makes their present motion for emergency relief problematic.

█ Duke Intervenors argue finally that this court should enter an order to show cause why Defendants should not be held in contempt of court. (Doc. 440 at 21.) To establish civil contempt, in addition to establishing the existence of a valid decree in their favor (which is not contested), movants must demonstrate <u>clear and convincing</u> evidence that the alleged contemnor knowingly violated the terms of the decree. <u>JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.</u>, 359 F.3d 699, 705 (4th Cir. 2004). This is a high bar, and Duke Intervenors simply have not met it.

### III. CONCLUSION

For the reasons set forth above, the motion to enforce injunction and request to show cause (Doc. 439, 440) are DENIED.

The court warns, however, that merely because the movants have failed to demonstrate a violation of this court's injunction warranting contempt does not permit CBOEs or the SBOE who may disagree with the court's ruling implementing the Fourth Circuit's decision to engage in conduct that otherwise constitutes a violation of the Voting Rights Act and the Constitution. Such conduct will subject the participants to separate litigation for appropriate relief.